# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JULIA VANESSA HILLMAN,          Case No. 1:05-cv-320
     Plaintiff

                             (Hogan, M.J.)

     vs

GREEN BAY PACKAGING, INC.,        **ORDER**
     Defendant

Plaintiff Julia Vanessa Hillman brings this action pro se against defendant Green Bay Packaging, Inc., alleging that defendant discriminated against her on the basis of her race and sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq*. (Title VII), Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99; that defendant discriminated against her on the basis of her race in violation of 42 U.S.C. § 1981; that defendant discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*., Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99; and that defendant retaliated against her in violation of Title VII, 42 U.S.C. § 2000e-3(a), Ohio Rev. Code § 4112.02(I), and Ohio Rev. Code § 4112.99. (Docs. 1, 17)[1]. This matter is before the Court on defendant's motion for summary judgment (Doc. 20), to which plaintiff has not responded.

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

---

[1]On March 23, 2006, plaintiff filed an amended complaint that requested an increased damage award but alleged no additional substantive claims against defendant. (Doc. 17).

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989).  "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50.  The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2

## I. FACTS

Defendant presents the following evidence in support of its motion for summary judgment which, as noted above, has not been opposed by plaintiff:[2]

Ms. Hillman is a 51 year old black female who was born on August 6, 1955. (Doc. 1, ¶ 1). Green Bay Packaging hired Ms. Hillman as a production worker on December 13, 1999. (Doc. 20, Declaration of Gary L. Fry dated August 4, 2006 ("Fry Decl."), ¶ 7; Ex. 2). Plaintiff was dismissed from her employment on August 28, 2006, after exceeding the allotted number of points under the Company's no-fault attendance policy. (Doc. 20, Declaration of Thomas Fullove dated October 19, 2006 ("Fullove Decl."), ¶ 1).

Green Bay Packaging is a privately owned company whose headquarters are in Green Bay, Wisconsin. The Company is engaged in the paper and forest products industry and manufactures a variety of packaging products, including linerboard, shipping containers, and folding cartons. The Company has more than 25 different divisions in Wisconsin and other states, each of which enjoys a high degree of autonomy in its day-to-day operations. (Doc. 20, Fry Decl. ¶ 4).

The Cincinnati Division is part of the Company's converting operations and manufactures corrugated containers, which are sometimes incorrectly referred to as "cardboard" boxes. Gary L. Fry is the Production Manager of the Cincinnati Division, Dwayne Owens is the Production Superintendent, and Thomas Fullove is the Human Resource Development Manager. All are personally acquainted with Ms. Hillman. (Doc. 20, Fry Decl. ¶ 5; Declaration of Dwayne Owens dated August 15, 2006 ("Owens Decl."), ¶ 1; Fullove Decl. ¶ 1). Rick L. Stigers, who

---

[2]In failing to file a memorandum in opposition to defendant's motion for summary judgment, plaintiff has failed to offer any facts or evidence to support her claims. As such, the facts as presented by defendant are undisputed.

now works for another company, was a supervisor at the Cincinnati Division from January 1997 until

January 2005. He was also personally acquainted with Ms. Hillman and was one of her immediate supervisors. (Doc. 20, Declaration of Rick L. Stigers dated August 11, 2006 ("Stigers Decl."), ¶ 1).[3]

The policies and procedures relating to production employees during the time period covered by the Complaint—approximately July 2001 to May 2005—were in the 2000–2005 Collective Bargaining Agreement ("CBA") between the Company and Local 5-1567 of the Paper, Allied-Industrial, Chemical and Energy Workers International Union ("PACE").

The Company's workplace has expensive and complicated machinery, including a corrugator and two flexo folder gluers. The corrugator fuses a "medium" between two sheets of papers, producing corrugated paper that is ready to be made into boxes. Among other machines, the Company uses two Langston flexo folder gluers in the box manufacturing process. (Doc. 20, Fry Decl. ¶ 9). The Company has a 37-inch and a 50-inch flexo folder gluer. Each machine slots and scores the corrugated paper, prints the information required by the customer, and applies glue to the glue tab. The end product, a knock down flat ("KDF") box, is then shipped to the Company's customer and packed with products at the customer's plant. (Doc. 20, Fry Decl. ¶ 10).

The flexo folder gluers are massive machines. Each machine is more than 60 feet long and each is capable of producing between 250 and 300 KDF boxes per minute. The 37-inch

---

[3]The Fry, Owens, and Stigers Declarations were all executed prior to the termination of Ms. Hillman's employment effective August 28, 2006, and therefore refer to Ms. Hillman as a current employee of Green Bay Packaging.

machine makes smaller boxes than the 50-inch machine and the setup process is less automated. The operator of the 37-inch machine must make certain adjustments based on "feel" and judgment.  The 37-inch machine also has a twin-box slitter that allows the production of two KDFs simultaneously. (Doc. 20, Fry Decl. ¶ 11; Ex. 3 and 4).  Production jobs at the Company are either bid jobs or line-of-progression jobs.  The bottom job in a line of progression and all non-progression jobs are bid jobs.  When there is a permanent vacancy, the job is posted, and the most senior qualified employee who bids is awarded the job.  Jobs on the corrugator, flexo folder gluers, and certain other jobs are line-of-progression jobs.  A permanent vacancy in a line of progression is filled by the next-most-senior employee in the next lowest job in progression if the employee is qualified to move up.  The only two jobs in the flexo line of progression are Operator and First Helper; the Second Helper job is not filled. (Doc. 20, Fry Decl. ¶¶ 12–13 and 15; CBA Art. XVI, Ex. 1, pp. 23–28; Ex. A and Ex. B to CBA, Ex. 1, pp. 55–56 and 59).  While the line of progression in the CBA does not distinguish between the 37-inch flexo and the 50-inch flexo, Flexo Operators and Flexo Helpers are typically assigned to one machine or the other. The following table shows the typical assignments in effect as of June 1, 2006:

| Folder Gluer | Job | First Shift | Second Shift |
|---|---|---|---|
| 37-inch | Operator | Mark Dransman | Nick Sadouskas |
| | First Helper | Dennis Back | Ryan Gardner |
| 50-inch | Operator | Tom Stewart | Bryan Casada |
| | First Helper | Julia Hillman | Jeff Baxter |

Mark Dransman and Tom Stewart, the most senior Operators, worked the first shift; Nick Sadouskas and Bryan Casada, the two most junior Operators, worked the second shift.

Similarly, Ms. Hillman and Dennis Back, the most senior First Helpers, worked the first shift; Ryan Gardner and Jeff Baxter, the two most junior First Helpers, worked the second shift. (Doc. 20, Fry Decl. ¶ 14).

Between December 1999 and January 2002, plaintiff was given training covering a broad range of subjects, including personal protective equipment, safety procedures, ISO-9000, glue detectors, waste removal from ink buckets and glue drums, and the operation of the 37-inch and 50-inch flexo folder gluers.  With respect to operation of the two flexos, Ms. Hillman was given two weeks of individualized training on the 50-inch flexo in January 2001 and an additional two weeks of individualized training on the 37-inch flexo in September and October of 2001. (Doc. 20, Fry Decl. ¶¶ 16–17 and 19–20; Ex. 6–21 and 23–27).  Supervisor Rick A. Stigers personally provided training to Ms. Hillman on the operation of the 37-inch and 50-inch flexos in September and October 2001. (Doc. 20, Stigers Decl. ¶ 5).  According to Mr. Stigers, a Helper normally "picks up" procedures by working with an Operator: "This is the normal way we train; learn on the fly & over a period the Helpers are supposed to pick up how the flow & routines are done.  The Helper has to show some sort of desire to learn so they can move up."  Mr. Stigers states that Ms. Hillman did not have the drive or desire to "pick up" the operation of the flexos in her day-to-day work.  Further, she did not retain the things she was taught, even when she received extra help and additional training. (Doc. 20, Stigers Decl. ¶6; Ex. 25, fourth page).

On July 24, 2001, Ms. Hillman filed a charge of discrimination with the Ohio Civil Rights Commission (OCRC).  She claimed she had not been given sufficient training to move up to the Operator position because of her race and sex and purported to describe examples of situations where other employees had improperly been allowed to serve as Operators.  The Company did

not learn about the charge until 2002 and, after it received a copy, decided to take advantage of the OCRC's dispute resolution procedure.  As a result of this procedure, the Company entered into a negotiated settlement agreement with Ms. Hillman and the OCRC in April 2002 that fully resolved the charge by means of a payment of $500 and an agreement to continue to provide training to her. (Doc. 1, ¶ 12; Doc. 20, Fry Decl. ¶¶ 18, 21, and 23; Ex. 22 and 28; Fullove Decl. ¶ 4).

The negotiated settlement agreement stated in Section 2.b. that the Company agreed to "[c]ontinue to provide" training in accordance with its Job Skills and Knowledge Program, that "hands on" training on the flexo folder gluers had begun, and that additional training appeared to be necessary.  Section 2.b. then stated that the Company could provide additional training by bringing a consultant to the workplace and specified that Dick Target would be an appropriate consultant to provide such training. (Doc. 20, Fry Decl. ¶ 23; Ex. 28).  Dick Target provided training to Ms. Hillman and other Company employees in the flexo folder gluer line of progression on October 7, 8, and 9, 2002.  The training covered all facets of flexo operation and maintenance. (Doc. 20, Fry Decl. ¶ 24; Fullove Decl. ¶ 5; Stigers Decl. ¶ 7; Ex. 31–32).

The contemporaneous written reports of the Company's supervisors describe a variety of problems with plaintiff's job performance.  For example, Supervisor Rick Stigers' notes for September 28, 2001, state that he had met with Ms. Hillman because "for whatever reason she had an attitude about being trained."  She had missed learning a particular setup because she had been driving a tow motor.  Mr. Stigers further reported:

> I told her to stay here with Kelly & let Dennis do his job, it wasn't your job to help him. I also told her that I didn't want to hear how she wasn't getting trained when you're driving a tow motor in the back of the plant. After we talked we had another meeting, she turned in a grievance.

7

> We talked for around 10 min. I told her that we were not in violation of [the] current labor agreement. We went on to talk, I went over some more requirements for Operator, told her the Operator is the boss of the machine, that whatever his Helper does on the job they are responsible. The Operator has to set the tempo & dictate the whole ball of wax.

(Doc. 20, Fry Decl. ¶ 19; Stigers Decl. ¶ 4; Ex. 25).

Approximately a year later, and after the additional training provided by Dick Target, Ms. Hillman's performance had not improved.  Mr. Stigers' note of October 15, 2002, described Ms. Hillman's difficulties in operating the 50-inch flexo on that date:

> Until this day I didn't realize how much Tom S. was helping Julia, I should say do the job for her. Since Julia was going solo she really struggled. She had to rely on her knowledge, needless to say I stayed busy. I wasn't really able to leave the machine for any great lengths.  When I did leave, she was calling me back to help with issues. Julia's setups were extremely long.  She still constantly put dies on wrong, loose and mounted. Really not sure how to adj. analox roll. Julia really doesn't understand the concept of a box.

(Doc. 20, Fry Decl. ¶ 25; Stigers Decl. ¶¶ 4, 8; Ex. 33).

On October 23, 2002, Mr. Stigers noted that "Julia just doesn't retain what she has been taught (forgets a lot)."  On October 30, 2002, he noted that "Tom still covers for her during her day to operate" and that "Julia has yet to find a routine for her set-up procedure." (Doc. 20, Fry Decl. ¶ 26; Stigers Decl. ¶¶ 4, 8; Ex. 34–35).  Mr. Stigers' note concerning the events of November 20, 2002 states:

> Julia is still struggling on [the] 50, she is still putting die on wrong that are on 1 piece of tin. She still doesn't understand how the glue system works. I have Tom help Julia complete set-up so we can start production. During the set-ups she still seems unsure of what she is doing, she shows no confidence in what she is to do. Julia shows no sense of urgency to learn the job. The thing that upset me was when she made errors she laughed, like oh well no big deal. Tom is the person she kids with when an error is made. During the runs Tom makes sure the boxes are good & machine stays running. Julia expects Tom to do that. Julia is showing no improvement at all on this machine.

8

(Doc. 20, Fry Decl. ¶ 27; Stigers Decl. ¶¶ 4, 8; Ex. 36).

Ms. Hillman's performance evaluation of November 26, 2002, contains several comments by Rick Stigers about her job performance.  Under the heading "Work Quality," Mr. Stigers noted, "Julia needs to do a better job in quality checking."  Under "Productivity" he noted, "Needs to manage time better, effort has fallen off.  Shows no pep in step to help Operator with next job."  Mr. Stigers' overall comments were: "Julia needs to start showing she wants to be an Operator.  She needs to start by setting an example, helping Operator with set-ups, keep work area clean, take the initiative upon yourself to do something and not be told." (Doc. 20, Fry Decl. ¶ 28; Stigers Decl. ¶ 9; Ex. 37).

Since Mr. Stigers only worked with Ms. Hillman for an hour on November 27, 2002, another supervisor explained that he had "Talked with the two operators on how to train Julia and the routine to get in."  This process continued for the next few days without much success.  Mr. Stigers did describe Ms. Hillman's work during the next few days, concluding as follows:

> Today wasn't a good day. Julia still struggles on the pre-feeder can't seem to get it right—always fighting it.  Showed her again how to set it up. She was jamming it up at feed table, not paying attention while machine was running. We lost a lot of run time for carelessness or not knowing what to do, when she has been told what to do.  One occurrence today was she wasn't paying attention & pre-feeder filled up w/ sheets & caused a jam up at feed table, so she runs over & hits e-stop while pre-feeder was running & computer lost its memory.  I don't know how many times Ron has told them & us don't hit e-stop when in cycle or running. . . . It's the every day things that are giving her trouble.  If you tell her to do something she tries to do it, but when she finishes that she doesn't know what else to do.  She doesn't see the big picture.  You constantly have to direct her.  At what point do you stop going over the same things?

(Doc. 20, Fry Decl. ¶ 29; Stigers Decl. ¶ 4; Ex. 38–39).

Rick Stigers' notes from December 2002 show Ms. Hillman was not making progress.  On December 4, 2002, Mr. Stigers noted that "Julia still has trouble setting up the glue pattern and

making proper adjustments." His observations on December 16, 2002 state: "Has no clue on how boxes are made. Set pull rolls wrong, put dies on wrong. She doesn't know how to do things manually. It has to be set up for her. She is clueless on how to do it." (Doc. 20, Fry Decl. ¶ 30; Stigers Decl. ¶4; Ex. 40).

Mark Dransman, who normally operates the 37-inch flexo, when asked whether Ms. Hillman was capable of being a Flexo Operator, answered "No." He stated further, "I've seen her run the 50-inch before when Tom [Stewart] was gone and they usually have to put somebody else over there because she couldn't do it." (Doc. 20, Deposition of Mark Dransman ("Dransman Dep.") p. 24). Mr. Dransman observed that more supervisors needed to work with and train Ms. Hillman when she was operating the 50-inch flexo than when other employees were serving as Operators. (Doc. 20, Dransman Dep. p. 32). He also confirmed that Ms. Hillman received training from Rick Stigers. (Doc. 20, Dransman Dep. p. 36).

Thomas A. Stewart, who operates the 50-inch flexo, also testified on his observations of Ms. Hillman based on her work as his First Helper for the past three years. (Doc. 20, Deposition of Thomas A. Stewart ("Stewart Dep.") pp. 5-6). He said "there were many occasions" when "I'd work with her for a little while, you know, and then a few months later . . . she'll ask me the same questions again . . . ." (Doc. 20, Stewart Dep. pp. 16-17). He explained, "It seemed like she would catch on for a little while and then if she went a few weeks or a month or so without really doing too much, then she'd be back asking the same questions again, you know." (Doc. 20, Stewart Dep. p. 17). He added, "I always told her it's something that she should remember, you know." (Doc. 20, Stewart Dep. p. 18). Asked to describe Ms. Hillman's performance as First Helper, Mr. Stewart testified:

> Oh, there was a lot of times where I knew she knew the knowledge as far as being first helper, but I had a problem with her, you know—what I consider laziness, you know. I mean, she—seemed to me like she drug her feet doing her job instead of coming back and helping in the back like she was supposed to. So I'd wind up pretty much setting the machine up a lot of time by myself because she'd be, you know, talking . . . ."

(Stewart Dep. p. 26).

On August 6, 2003, plaintiff filed a second charge of discrimination with the OCRC. Ms. Hillman claimed that the Company had discriminated against her because of her race and sex and retaliated against her for filing her previous charge by (1) allowing her to be subjected to "harassment" by a second-shift Flexo Operator, Bryan Casada, (2) denying her training opportunities on the 37-inch flexo folder gluer, and (3) denying her the opportunity to operate the 50-inch flexo folder gluer. (Doc. 1, ¶ 14; Doc. 20, Fry Decl. ¶ 31; Ex. 41).

The Company disputed Ms. Hillman's claims in an extensive Position Statement filed with the OCRC. (Doc. 20, Fry Decl. ¶ 32; Fullove Decl. ¶ 6).

In a decision dated April 1, 2004, the OCRC decided there was no probable cause to believe that illegal discrimination or retaliation had occurred and dismissed Ms. Hillman's charge.

The OCRC rejected Ms. Hillman's claims that she had improperly been denied training and the opportunity to move up to Operator positions, stating:

> Sign-in sheets for training sessions support that Charging Party received formal training prior to and after entering the NSA [negotiated settlement agreement] with Respondent. Documented performance assessments support that Charging Party received a substantial amount of hands-on training and opportunities to step into Operator positions during temporary vacancies. The assessments support that Charging Party was unable to grasp the essential skills needed for the Operator positions. Therefore, it was reasonable for Respondent to place persons with less classification seniority than Charging Party into the Operator positions when needed.

11

(Doc. 20, Fry Decl. ¶ 33; Ex. 42).

Plaintiff sought review of the OCRC's decision by the Equal Employment Opportunity Commission (EEOC).  The EEOC issued a dismissal and right-to-sue notice on July 8, 2004, that adopted the findings of the OCRC.  Ms. Hillman did not take any further action with respect to the second charge. (Doc. 20, Fry Decl. ¶ 35; Ex. 43).

On November 10, 2003, the Company experienced what Production Manager Gary Fry described as the "last straw" with regard to Ms. Hillman's performance as a temporary Flexo Operator.  On that date, she had been moved up to operate the 50-inch flexo folder gluer. Functioning as an Operator, she had made only four setups during an eight-hour shift, taking an excessive amount of time to do so.  Her average production was only 1627 boxes per hour, which was well below the plant's yearly average of 6866 boxes per hour and the monthly average for October 2003 that exceeded 7400 boxes per hour.  Moreover, the Company had to scrap approximately 1500 of the boxes Ms. Hillman had made because of improper slot registration. Finally, Ms. Hillman had been unable to make proper machine adjustments necessary to make an acceptable product, and the Production Superintendent had to make the necessary adjustments. (Doc. 20, Fry Decl. ¶ 37; Owens Decl. ¶ 4).

In a memorandum to Ms. Hillman dated November 17, 2003, Mr. Fry summarized the information given in the preceding paragraph and pointed out that the Company had been required to schedule twelve-hour shifts to meet its commitment to customers because of Ms. Hillman's mistakes.  Mr. Fry also said the volume of the Company's business had recently increased and that the Company could no longer afford to absorb the extra time and extra costs that Ms. Hillman's deficient work performance had caused.  The memorandum concluded:

The Company has therefore decided that you will no longer be moved up to the
Operator position on a temporary basis and, unless you transfer to another job, that
you will be frozen in the First Helper position. Currently there are four positions
open in the plant that you could be transferred to. They are Corrugator Offbearer,
Die Cutter Helper, Stockhandler, and Checkerloader.  All these positions are
available on the second shift.  If you elect not to take one of these positions you
will be left in your current classification but you will not be given the opportunity
to move up in the line of progression.

Julia, I am sorry that I have to give you this news.  Please think over this situation
and let me know in the next few days whether you want to transfer to one of these
vacant jobs or be frozen in the First Helper position.

(Doc. 20, Fry Decl. ¶ 38; Fullove Decl. ¶ 7; Ex. 44).

Ms. Hillman's local union filed a grievance on her behalf on or about November 19, 2003.

Article VII of the CBA provides a four-step grievance procedure that is summarized below:

| | |
|---|---|
| First Step | Oral grievance submitted to the immediate supervisor. |
| Second Step | Written grievance considered by local union and Company representatives. |
| Third Step | Further consideration by local union and Company representatives and a representative of the international union. |
| Fourth Step | Arbitration. |

(Doc. 20, Fry Decl. ¶ 40; Ex. 1, pp. 7–11; Ex. 45).

In the grievance, Ms. Hillman claimed it was unfair for her to have been taken out of the

line of progression because "she had one bad production day, due to machine problems all day."

The Company's Second Step answer denied the grievance, stating:

Our decision was not based solely on 1 day of poor productivity; our decision was
based on our own observations over a long period of time as well as feedback from
Supervisors while grievant was performing Operator duties.

The events on November 10, 2003 were the culmination of a number of instances
of inadequate performance that has not been remedied despite repeated training.

(Doc. 20, Fry Decl. ¶ 41; Ex. 45–46).

13

The Third Step meeting was held on February 6, 2004. The Company adhered to its previous decision, and denied the grievance. After a time extension on the issue of arbitration, the union, by a letter dated March 1, 2004, stated it disagreed with the decision but did not wish to pursue the matter to arbitration. No further action has been taken under the CBA, and Ms. Hillman remained frozen in the Flexo First Helper position. (Doc. 20, Fry Decl. ¶ 42; Ex. 47–49).

In her Complaint, Ms. Hillman also avers that certain work assignments made by the Company were discriminatory or retaliatory. The factual circumstances for these assignments are described below.

**A. Dennis Back Working as an Operator on January 2, 2004**

Dennis Back was assigned to work as an Operator on the 37-inch flexo and the 50-inch flexo on January 2, 2004, while Mark Dransman was on vacation. Like Ms. Hillman, Mr. Back is over the age of 40, but he is Caucasian. On January 2, 2004, he was a Flexo First Helper and was eligible to move up to Operator in the flexo line of progression. Ms. Hillman had been frozen in the First Helper position on November 17, 2003, so was not eligible to move up to Operator on January 2, 2004. (Doc. 1, ¶ 16; Doc. 20, Fry Decl. ¶¶ 44, 48; Owens Decl. ¶ 6; Ex. 44).

**B. Temporary Assignment of Kelly Wilson on April 8, 2004**

Kelly Wilson was assigned to operate the 37-inch flexo on April 8, 2004, while Jerry Sears, Jr. was on vacation. Mr. Wilson was formerly in the flexo line of progression but had transferred to a job on the die cutter. His assignment to the 37-inch flexo was a temporary assignment under Article XVI, Section 16.09 of the CBA. (Doc. 20, Fry Decl. ¶¶ 45–46; Owens Decl. ¶ 6; Ex. 1, p. 26).

**C. Events Following Promotion of Jerry Sears, Jr. in April 2004**

14

On April 12, 2004, Jerry Sears, Jr. was promoted to the position of Lead Person.  The promotion created a vacancy in the position of Flexo Operator.  The vacancy was filled by Dennis Back, the next most senior First Helper after Ms. Hillman.  Ms. Hillman was not allowed to move up because she had been frozen in the First Helper position. (Doc. 1, ¶¶ 17, 22; Doc. 20, Fry Decl. ¶¶ 47–48; Owens Decl. ¶ 7).

Production Superintendent Dwayne Owens met with Mr. Back on April 20, 2004, to make sure he was ready for the move, telling him "that we are growing and he needs to perform."  On April 26, 2004, Supervisor Rick Stigers also met with Mr. Back to be sure he understood his new duties. (Doc. 20, Fry Decl. ¶ 48; Ex. 50–51).

Mr. Back's service as an Operator did not go well.  Rick Stigers' notes for the period from May 7 through May 27, 2004, described the problems Mr. Back experienced.  Mr. Back took too long making setups and he required extensive help from others.  These problems were discussed with him on May 17 and June 2, 2004. (Doc. 20, Fry Decl. Ex. 49; Owens Decl. ¶ 7; Ex. 52–54).  Because of Mr. Back's performance problems, the Company removed him from the flexo line of progression effective June 7, 2004.  Mr. Back was assigned to the General Labor classification and Nick Sadouskas moved up from First Helper to Operator.  Mr. Back filed a grievance that the Company denied and that the union did not pursue (Doc. 20, Fry Decl. ¶¶ 50–51; Owens Decl. ¶¶ 7–8; Fullove Decl. ¶ 8; Ex. 55-58).

Once Nick Sadouskas moved up to Operator, the Company was required to permit bidding on the Flexo First Helper position he had vacated.  Dennis Back was the only bidder and was therefore reinstated to his former job as First Helper.  Mr. Fry stated the Company was willing to give Mr. Back another chance as First Helper because it was possible he would benefit from

additional training.  He had not received as much training as Ms. Hillman and the Company was not willing to attempt to remove him permanently from the line of progression until he was given additional training. (Doc. 20, Fry Decl. ¶ 52; Owens Decl. ¶ 8; Fullove Decl. ¶ 8 & n.3).

### D. Nick Sadouskas Promoted to Operator in April 2004

Nick Sadouskas—erroneously referred to in the Complaint as Michael Sandouska—was moved up to Flexo Operator when Dennis Back was removed from the flexo line of progression. The move was effective on June 7, 2004, not in October 2004 as alleged in the Complaint.  Ms. Hillman was not eligible to move up because she had been frozen in the First Helper position. (Doc. 1, ¶ 20; Doc. 20, Fry Decl. ¶ 53; Owens Decl. ¶ 9; Ex. 56).

Ms. Hillman filed her third charge of discrimination with the EEOC on or about July 21, 2004.  She claimed the Company had discriminated against her based on her race, sex, and age, and had retaliated against her because of her previous charges.  The Company filed an extensive Position Statement in response to the charge and the charge was dismissed by the EEOC on February 10, 2005. (Doc. 1, ¶ 15; Doc. 20, Fry Decl. ¶ 56; Fullove Decl. ¶ 6; Ex. 59-60).

Plaintiff filed the instant lawsuit on May 10, 2005. (Doc. 1).

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RACE, SEX, AND AGE  DISCRIMINATION CLAIMS IS GRANTED.

Plaintiff claims she was discriminated against on the basis of her race, African American, in violation of 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, Ohio Rev. Code § 4112.02(A), and Ohio Rev. Code § 4112.99.  She also claims defendant discriminated against her on the basis of her sex and age.  Title VII makes it unlawful for an employer to discharge an individual or to otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges

16

of employment because of such individual's race or sex. 42 U.S.C. § 2000e-2(a)(1). The standards for establishing a discrimination claim under Title VII are equally applicable to plaintiff's claims under 42 U.S.C. § 1981 and Ohio Rev. Code § 4112. *See Amini v. Oberlin College,* 440 F.3d 350, 358 (6th Cir. 2006); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). The ADEA precludes discrimination against an employee because of his or her age. 29 U.S.C. § 623(a)(1). Claims of discrimination brought pursuant to Title VII, 42 U.S.C. § 2000e et seq., and the ADEA, 29 U.S.C. § 621 et seq., are analyzed under the same burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582.

The *McDonnell Douglas* burden-shifting analysis requires that the plaintiff first establish a *prima facie* case of discrimination. *Id.* A plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114-15 (6th Cir. 1987)(citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802. *See also Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). A plaintiff may establish a *prima facie* case of race, sex or age discrimination by showing: (1) she is a member of the protected class for her respective race, sex, and age claims (African American, female, over the age of 40); (2) she suffered an adverse employment action; (3) she was qualified for the position lost; and (4) she was replaced by someone outside the protected class (a Caucasian, male or younger worker) or treated differently than a similarly situated person. *McDonnell Douglas*

17

*Corp.*, 411 U.S. at 802; *Gray v. Toshiba*, 263 F.3d 595, 598 (6th Cir. 2001); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 351 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).  Such proof "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The employer is entitled to judgment if the plaintiff does not establish a *prima facie* case.  *Mitchell*, 964 F.2d at 582-84.

Once plaintiff has presented evidence sufficient to establish a *prima facie* case of discrimination, the burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 802.   If defendant meets this burden, the burden of production shifts back to plaintiff to demonstrate that defendant's articulated reason is merely a pretext for unlawful discrimination. *Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 804. In other words, plaintiff must show that the proffered explanation is unworthy of credence or that defendant was more likely motivated by a discriminatory reason. *Manzer*, 29 F.3d at 1082.  There must be "a sufficient basis *in the evidence*" for rejecting an employer's stated explanation for its action. *Manzer*, 29 F.3d at 1083 (emphasis in the original).  *See also Gray*, 263 F.3d at 600. Summary judgment in favor of defendant is appropriate where plaintiff is unable to demonstrate pretext sufficient to rebut defendant's legitimate, non-discriminatory reasons. *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993).  "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination *and* that the employer intended to discriminate on the basis of race." *Thurman*, 90 F.3d at 1166 (emphasis in the original), citing *St. Mary's Honor Center*, 509 U.S. 502, 113 (1993).

In the instant case, the record fails to disclose any direct evidence of intentional discrimination on the part of defendant. With respect to the circumstantial showing of discrimination, it is undisputed that plaintiff is an African American female over the age of 40 and a member of the protected class for her respective race, sex, and age discrimination claims. However, plaintiff fails to prove a *prima facie* case of discrimination with respect to her three principal claims: (1) that she was not given adequate training; (2) that she was improperly frozen in the First Helper job in November 2003; and (3) that she was discriminated against with regard to certain temporary assignments, promotion, and pay.

### A. Plaintiff's Claim of Inadequate Training

Plaintiff's complaint alleges that her job "is progressive under [the] union contract, but Defendant has refused to train [Plaintiff] to allow her to move up." She further alleges that she was not "given 'hands on treatment' by Dick Tagart [sic] as required in the 2002 settlement agreement" that resolved her first charge of discrimination with the OCRC. (Doc. 1, ¶¶11, 13). To the extent plaintiff claims she was qualified to be given training and that the failure to train constitutes an adverse employment action,[4] plaintiff nevertheless fails to establish she was treated less favorably with regard to training than non-minority male employees age 40 and older. Defendant presents evidence showing that plaintiff was repeatedly trained on the operation of the Company's flexo folder gluers and various related tasks since becoming a Flexo Helper in January 2000. (Doc. 20, Ex. 8). The Declaration of Production Manager Gary Fry and the exhibits thereto set forth the specific training given to plaintiff. (Doc. 20, Exs. 10, 11, 13, 14, 15, 19, 23, 24, 25, 27, 31-32, 39-40). In addition, all of defendant's witnesses have testified that

---

[4]Defendant assumes for purposes of the motion for summary judgment only that plaintiff was qualified to receive training and that the failure to train an employee could constitute an adverse employment action.

plaintiff received more training than any other production employee. (Doc. 20, Fry Decl. ¶¶ 16–30; Owens Decl. ¶ 4; Stigers Decl. ¶ 13; Fullove Decl. ¶ 4–6).  In particular, plaintiff received more training than Dennis Back, a white male Flexo First Helper who, like Ms. Hillman, is over the age of 40. (Doc. 20, Fry Decl. ¶¶ 48, 52).  Because plaintiff failed to respond to the motion for summary judgment, she presents no evidence showing she was treated less favorably than any other similarly situated employee, or was otherwise denied training opportunities because of her race, sex, or age. Accordingly, plaintiff fails to establish a *prima facie* claim of discrimination on her failure to train claim.

### B. Plaintiff's Claim that she was Improperly Frozen in the First Helper Job in November 2003

Plaintiff's complaint also alleges that "she was intentionally removed under pretext by Gary Fry, Manager, from being able to advance in progression." (Doc. 1, ¶21).  Plaintiff fails to establish a *prima facie* case of discrimination on this claim because she fails to show she was qualified to be an Operator or that she was treated less favorably than similarly situated male or non-minority employees.

Defendant presents evidence that despite the extensive training she received, plaintiff was never able to master the fundamental skills necessary to function in the Operator position.  The evidence shows her setups took far too long, she did not know how to perform basic tasks, and she relied on others to perform functions that she should have known how to do. (Doc. 20, Exs. 33, 35, 36, 37, 39, 40).  The evidence shows that matters came to a head on November 10, 2003, when plaintiff moved up to operate the 50-inch flexo.  Her setups took an excessive amount of time and her average production, only 1627 boxes per hour, was well below the plant's yearly average of 6866 boxes per hour and the monthly average for October 2003 of more than 7400

boxes per hour.  The evidence shows that more than 1500 of the boxes she made had to be scrapped because of improper slot registration.  In addition, plaintiff was not able to make the proper machine adjustments, which the Production Superintendent had to make for her.  The Company had to schedule twelve-hour shifts to make up for the lost production caused by plaintiff and to meet commitments to customers. (Doc. 20, Fry Decl. ¶ 37; Owens Dec. ¶ 4; Ex. 44).  On November 17, 2003, Production Manager Gary Fry determined that further training would not help plaintiff move up to an Operator's job and offered her a transfer to another job in lieu of remaining frozen in the First Helper position. (Doc. 20, Fry Decl. ¶ 38; Fullove Decl. ¶ 7; Ex. 44).  Plaintiff chose to remain in the First Helper classification.  The undisputed evidence shows that plaintiff was unable to perform the Operator's position and that the Company's decision to disqualify plaintiff for any further advancement was reasonable under the circumstances.

Nor has plaintiff presented any evidence that she was treated less favorably than similarly situated male or non-minority employees.  The evidence shows that Dennis Back, the only possible comparable, was not similarly situated because he was not frozen in the First Helper position as was plaintiff when the Operator position became available.  In addition, he was promptly removed from the Operator position and moved off the flexo line of progression when he was unable to adequately perform the Operator position.  Plaintiff again has failed to present any evidence creating an issue of fact in this regard and thus fails to establish a *prima facie* case of discrimination based on her claim that she was improperly frozen in the First Helper position.

**C. Plaintiff's Claim that she was Discriminated Against with Regard to Certain Temporary Assignments, Promotion, and Pay**

21

Plaintiff also fails to present a *prima facie* case of discrimination with respect to her claim that she was passed over for temporary work assignments. (Doc. 1, ¶¶16, 18).  First, plaintiff fails to present evidence that she was qualified for such assignments.  *See supra* pp. 20-21.  Second, plaintiff fails to show that she suffered an adverse employment action by not acquiring the temporary assignments.  "[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987) (temporary transfer which resulted in no pay or benefits reduction does not constitute adverse action)).  Plaintiff has presented no evidence showing that she lost pay or benefits as a result of being passed over for the temporary assignments.  Therefore, she fails to establish a *prima facie* case on this claim.

Likewise, plaintiff fails to establish a *prima facie* case with respect to her claim that she should have been promoted to Operator instead of Dennis Back in April 2004 (Doc. 1, 22) and instead of Nick Sadouskas in October 2004 (Doc. 1, ¶20) because the evidence shows she was not "qualified" to serve as an operator once she had been frozen in the First Helper position in November 2003.

Finally, plaintiff fails to present any evidence supporting her claim that she was "treated differently in February 2004 through the present when younger, less senior, white males have been given preferential shift work and assignments . . . depriving plaintiff of pay and advancement in position." (Doc. 1, ¶19).  Plaintiff fails to identify the individuals to whom her complaint refers or to present evidence on this claim.  Therefore, she fails to establish a *prima*

*facie* case of employment discrimination with regard to her claims concerning certain temporary assignments, promotion, and pay.

Even assuming plaintiff can establish a *prima facie* case of race, sex, or age discrimination, defendant has articulated legitimate, non-discriminatory reasons for its decisions. Defendant presents evidence that it decided to freeze plaintiff in the First Helper position in November 2003 because she failed to grasp and adequately perform the fundamental tasks of operating a flexo folder gluer despite the extensive training she had been given.  Defendant also presents evidence that plaintiff was not selected for certain temporary assignments because she was not qualified to fill the positions at the time and ineligible to advance in the line of progression.  In addition, she was not paid as an Operator because she was not qualified to work as an Operator and was paid based on her assignment under the Collective Bargaining Agreement. (Doc. 20, Fry Decl. ¶55).  Plaintiff has failed to controvert defendant's stated legitimate, non-discriminatory reasons for the actions taken.  Therefore, defendant's motion for summary judgment on plaintiff's race, sex, and age claims (Counts I, II, III, VI, and VII) is granted.

## III.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIMS IS GRANTED.

Counts IV and V of plaintiff's Complaint assert retaliation claims.  In Count IV, Ms. Hillman alleges that Green Bay Packaging retaliated against her in violation of federal law by its "willful and malicious conduct, including its disparate treatment of Plaintiff in relation to her white peers." (Doc. 1, ¶39).  Count V asserts that the Company's conduct constituted retaliation in violation of Ohio Rev. Code § 4112.02(I).  To the extent plaintiff bases her retaliation claim on

23

the same bases for her discrimination claims, *i.e.*, that the Company did not adequately train her, improperly froze her in the First Helper job in November 2003, and discriminated against her with regard to certain temporary assignments, promotion, and pay, plaintiff fails to establish a *prima facie* case of retaliation.

To establish a *prima facie* case of retaliation pursuant to Title VII, a plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) the defendant knew she engaged in this protected activity; (3) thereafter, the defendant took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004), citing *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). These elements also apply to claims of discrimination under Ohio state law. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-583 (6th Cir. 1992) (citing *In re Brantley*, 34 Ohio App.3d 320, 518 N.E.2d 602 (1987)).

Plaintiff fails to show a causal connection between the protected activity, *i.e.,* the discrimination charges filed with the OCRC and EEOC, and the actions of defendant. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Here, plaintiff has failed to present any evidence showing a connection between her charges of discrimination and her claims that the Company did not adequately train her, improperly froze her in the First Helper job in November 2003, and discriminated against her with regard to certain temporary assignments, promotion, and pay. The undisputed evidence presented by defendant shows that plaintiff received extensive training which continued even

24

after she filed her second charge of discrimination in August 2003.  The evidence also shows that plaintiff was frozen in the First Helper position in November 2003 because she had not grasped the fundamentals of operating a flexo folder gluer despite her extensive training and performed poorly when given the opportunity to operate the machinery. Thereafter, she was denied temporary assignments and a promotion to the Operator position because she was not qualified to serve as an Operator.  Finally, the evidence shows that plaintiff was paid in accordance with the CBA.  In view of this undisputed evidence, plaintiff fails to show a causal connection between any alleged adverse actions and the filing of her discrimination charges and therefore fails to establish a *prima facie* case of retaliation.

Assuming, arguendo, that plaintiff made a *prima facie* showing of retaliation, defendant has proffered legitimate, nondiscriminatory reasons for its actions, *see supra* at p. 23, and plaintiff has failed to produce any evidence that defendant's articulated reasons were merely pretextual. *See Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.), *cert. denied*, 498 U.S. 984 (1990).  Accordingly, defendant's motion for summary judgment on plaintiff's retaliation claims (Counts IV and V) is granted.

For the foregoing reasons, defendant's motion for summary judgment (Doc. 20) is **GRANTED**.

**IT IS SO ORDERED**.

Date:_ 12/6/2006_____                                    _s/Timothy S. Hogan_____
                                                         Timothy S. Hogan
                                                         United States Magistrate Judge

1:05cv320    Doc. 21

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Julia V Hillman
1091 North Bend Rd.
Cinti, OH 45224

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                                     ☐ Agent
                                      ☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)          ☐ Yes

2. Article Number
   (*Transfer from service label*)    7002 0860 0006 5230 5356

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-0835